UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 13-10022-RGS

UNITED STATES OF AMERICA

v.

RENATO DE LA CRUZ

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

April 18, 2014

STEARNS, D.J.

Renato De La Cruz, who is charged with theft of public money and identity fraud, seeks to suppress statements made to federal agents on December 18, 2012, after his administrative arrest on immigration charges. De La Cruz maintains that he did not knowingly and voluntarily waive his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), and that his subsequent statements were not the result of a voluntary exercise of free will. An evidentiary hearing was held on March 13, 2014, and at counsel's request, defendant was permitted ten days (until March 24, 2014) to file a supplemental memorandum based on the testimony that emerged at the hearing.

FINDINGS OF FACT

Based on the credible testimony and exhibits offered into evidence, I found the following material facts.

1. Renato De La Cruz, entered the United States illegally sometime in the 1990s. He assumed the identity of Alberto Pena, a lawful permanent resident,

and under that name obtained a Social Security number, which was allegedly used to unlawfully obtain unemployment benefits.

2. On December 18, 2012, ICE agent Andrew Graham, accompanied by fellow ICE agents, sought to effect an administrative arrest of De La Cruz as an out-of-status alien. Aware of the fact that De La Cruz was the subject of a Department of Labor (DOL) criminal investigation, investigators from DOL (Christina Rosen) and the Social Security Administration (Jason Donnelly) were invited to take part.

3. The agents proceeded to an apartment building on Heritage Drive in Salem, Massachusetts, where De La Cruz was believed to be living with a girlfriend (Mayra Espinal). They arrived at the apartment building at 7:15 a.m. There they observed a silver Volkswagen that they believed to be owned by Espinal and driven by De La Cruz.

4. When De La Cruz did not appear, Graham and Agent Boyer proceeded to Espinal's apartment. While they did so, Agent Rosen, who had remained in the parking lot, observed Espinal peer out her apartment window. Rosen displayed her badge and motioned Espinal towards the apartment door. Espinal went to the door and responded to Graham's knock. Graham identified himself as a police officer and told Espinal (falsely) that he was looking for a person known to carry a firearm who had been seen driving her Volkswagen. He asked to come inside, but Espinal refused, explaining that her children were asleep. She volunteered to escort Graham to the parking lot and show him her car, which she did. While in the parking lot, she told Graham that her

boyfriend, Alberto Pena, drove the car on occasion. When Graham asked if he could speak to Pena, Espinal escorted the agents back to the apartment, went inside, and returned to the door with De La Cruz.

5. Speaking across the threshold, Graham identified himself as a police officer, and repeated the false story of looking for a man with a firearm. He stated that for safety reasons he wanted to conduct a frisk. De La Cruz agreed to submit to a frisk and invited Graham and a second agent (Brian Baga) inside the apartment. Once inside, Graham arrested De La Cruz and conducted a frisk search of his person.

6. After retrieving clothing for De La Cruz, the agents escorted him into the hallway where they were joined by Agent Rosen. Graham, who is fluent in Spanish, asked De La Cruz if he wished the *Miranda* warnings read in Spanish or English. De La Cruz replied English. Graham read the rights from a preprinted card in English, *see* Exhibit 1, and asked De La Cruz if he understood them. He stated that he did. According to the notes Agent Rosen recorded on her Blackberry, *see* Exhibit 2, as well as the testimony of Graham and Rosen, De La Cruz told Graham his true name, admitted that he was illegally in the United States, and that he had purchased the identity of Alberto Pena while living in New York in 1993 or 1994. He stated that he owed a lot of money, but had recently begun working for a local contractor. He also stated that, until recently, he had been living with an ex-girlfriend in Peabody, Massachusetts, and that he knew that she had turned him in.

7. At some point, Agent Rosen was handed a driver's license and a Social

Security card in the name of Alberto Pena, although she does not recall by whom. Graham too is uncertain how the license and Social Security card came into the agent's possession, although the likely explanation is that they were seized either by Graham or Baga during the frisk search incident to De La Cruz's arrest.

8. At approximately 8:00 a.m., De La Cruz was transported to the ICE offices in Burlington, Massachusetts, where he was processed by Agent Mark Anzelmo and served with a Notice to Appear. The Notice to Appear contained the standard immigration warnings, which differ from *Miranda* in stating (accurately) that, while a potential deportee is entitled to be represented by a lawyer, he is required to obtain one at his own expense. *See* Exhibit 6.

9. After the processing, Agent Rosen reintroduced herself to De La Cruz. She explained that the she was a criminal investigator and not an immigration officer. She then advised De La Cruz of his full *Miranda* rights. *See* Exhibit 3. Rosen explained to De La Cruz that she was investigating him for identity theft and benefits fraud and that it would be helpful to De La Cruz if he spoke truthfully. De La Cruz dictated a statement to Agent Rosen, which he then signed. *See* Exhibit 5.

10. Neither Espinal nor De La Cruz testified at the suppression hearing. De La Cruz did submit an affidavit in which he states that the officers entered Espinal's apartment without her permission and asked if he would submit to a search. When he agreed, Agent Rosen took the driver's license and Social Security card from his wallet. He maintains that the agents initially told him

that he was being taken into custody for an immigration offense and that the government would not provide him a lawyer at its expense. He alleges that only later did officers tell him that he could have a lawyer appointed at no expense, but by then, "I did not think that I could stop talking and ask for a lawyer at that point. I had already made a confession and they knew I was in the country unlawfully." Mot. to Suppress ¶ 20.

## RULINGS OF LAW

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," *United States v. Washington,* 431 U.S. 181, 187 (1977), the Supreme Court in *Miranda v. Arizona,* "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles,* 467 U.S. 649, 654 (1984). The warnings are as follows:

> [A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona,* 384 U.S. at 479.

The voluntariness of a confession and the validity of a waiver are separate issues; a statement may be voluntary and yet not be the product of a knowing and intelligent waiver of a constitutional right. *Edwards v. Arizona,* 451 U.S.

477, 483-484 (1981). Conversely, a waiver may be informed and intelligent and an ensuing confession nonetheless involuntary. *See Withrow v. Williams*, 507 U.S. 680, 712 (1993) (O'Connor, J., *dissenting in part*) ("It is entirely possible to extract a compelled statement despite the most precise and accurate of warnings"). The test for determining whether a suspect has effectively waived his rights under *Miranda* has been stated as follows: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances – even though the defendant may not know the *specific detailed* consequences of invoking it."). A confession is "voluntary" if it is "the product of an essentially free and unconstrained choice by its maker," *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), and "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

CONCLUSIONS OF FACT AND LAW

There is a fundamental factual flaw in the premise of defendant's motion. He argues that he did not knowingly waive his *Miranda* rights because had

been given administrative immigration warnings that, contrary to *Miranda*, state that he is not entitled to a lawyer at government expense. Only then, he claims, did he admit that he was not legally present in the United States and that he was using a false identity. Def's Mem. at 2. This version of events is not borne out by the facts. It was uncontroverted at the hearing that De La Cruz first received warnings while under arrest outside the door of the apartment and that the warnings that he was given were the full criminal *Miranda* warnings. As read from the preprinted card by Agent Graham, they included the advice that "[i]f you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish." *See* Exhibit 1. It was also uncontroverted that De La Cruz gave a fully incriminating statement to the agents prior to being transported to the ICE offices for immigration processing. Finally, it is uncontroverted that De La Cruz received a second set of full *Miranda* criminal warnings in writing prior to dictating an incriminating statement to Agent Rosen and, moreover, that he signed a written acknowledgment of his understanding of those rights before speaking. *See* Exhibit 3.

These facts bear no similarity to those in *Missouri v. Seibert*, 542 U.S. 600 (2004) (*plurality opinion*), on which De La Cruz relies. In *Seibert*, the Court criticized a "question first, warn later" technique of exploiting the exception to *Miranda* set out in *Oregon v. Elstad*, 470 U.S. 298 (1985). "It [would be] an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free

will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id*. at 309 (rejecting the so-called "cat out of the bag" doctrine).

In *Seibert*, the suspect was closely questioned without warnings, and after she confessed, was given a twenty-minute break. *Miranda* warnings were then administered and Seibert was walked back through the incriminating portions of her unwarned statement. A fractured Court condemned the deliberate use of the technique, although without a clear consensus as to whether an objective or subjective test of the interrogator's purpose is to be utilized or, where a violation is found, the exact nature of the appropriate remedy. None of the questions left open in *Seibert* need, however, be answered here, as none of De La Cruz's statements preceded his receiving the full *Miranda* warnings.[1]

Finally, I give no credence to De La Cruz's argument that his written statement to Agent Rosen was involuntary.[2] There is nothing in the record that suggests that she engaged in intimidating or oppressive conduct or that the environment in which De La Cruz was confined exceeded any of the ordinary

---

[1] For the same reason, *United States v. San Juan Cruz*, 314 F.3d 384, 386-389 (9th Cir. 2002), is inapplicable. In *San Juan Cruz*, the conflicting set of immigration and *Miranda* warnings were given serially by the same agent *prior* to defendant's initial statement.

[2] In his Motion and Supporting Memorandum, De La Cruz challenges only the second set of statements, although I would reach the same conclusion as to the first. Specifically, there was nothing coercive in Agent Graham's mild ruse suggesting that De La Cruz might have committed a firearms violation. *See United States v. Lall*, 607 F.3d 1277, 1285 (10th Cir. 2010).

incidents of custody. *Compare Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (*per curiam*) (suspect deprived of medication, food, and sleep); *Lynumn v. Illinois*, 372 U.S. 528 (1963) (mother threatened with the loss of her children); *Arizona v. Fulminante*, 499 U.S. 279 (1991) (informant offered to protect a fellow inmate from other prisoners in exchange for a confession). By all indications the period of custody leading to the second statement was relatively brief (three hours), there was a change of interrogators, and a fresh administration of the *Miranda* warnings.[3] Moreover, there was nothing impermissibly coercive in Rosen's implied promise to bring De La Cruz's cooperation to the attention of the prosecutor and the court. *See United States v. Fera*, 616 F.2d 590, 594 (1st Cir. 1980); *see also United States v. Pelton*, 835 F.2d 1067, 1072-1073 (4th Cir. 1987) (agents promised defendant leniency in exchange for his cooperation).[4]

---

[3] I do not find De La Cruz's suggestion that he was confused because of the lack of a Spanish interpreter to be credible. *See* Def.'s Mem. at 9. De La Cruz declined Agent Graham's (who speaks Spanish) offer to read the *Miranda* rights in Spanish. There was no testimony that De La Cruz at any point had difficulty responding to the agents in English. And in his affidavit, he admits that he speaks "a good deal of English." Mot. to Suppress ¶ 21.

[4] Immediately prior to the hearing, De La Cruz filed a Supplemental Motion to Suppress Evidence Obtained From Warrantless Search. While the grounds for suppression are not clear, De La Cruz seems to argue that his consent to a search, which he agrees in his affidavit that he gave, was invalidated by Agent Graham's pretense in gaining entry to the apartment that he was looking for a man with a gun (rather than an illegal immigrant). Deception in and of itself, however, does not invalidate consent. It is merely one of the factors to be considered in evaluating voluntariness in the totality of the circumstances. LaFave, 4 Search and Seizure § 8.2(n) (2012). Here, there

ORDER

For the foregoing reasons, the motion to suppress defendant's statements is <u>DENIED</u>.

                                                               SO ORDERED.

                                                                /s/ Richard G. Stearns
                                                                _____
                                                                UNITED STATES DISTRICT JUDGE

---

is nothing so untoward about Agent Graham's mild ruse that would vitiate De La Cruz's consent to his entering the apartment or the subsequent permission to search his person. *See United States v. Alejandro*, 368 F.3d 130, 137 (2d Cir. 2004) (no violation of the knock-and-announce rule where an officer serving an arrest warrant misrepresented himself as a gas company employee to gain entry).